19-2125, Bernadette Cedillo Good morning, Your Honor. My name is Bernadette Cedillo. I am with the Federal Public Defender's Office and I practice out of the Las Cruces branch in New Mexico. May it please the Court, Counsel. Under the Fourth Amendment, law enforcement officers should not have the right to harass ordinary citizens for no just cause. The officer in this case had a hunch and he got lucky. In the end, he ended up finding evidence of a crime, but how he got there is the reason that we're here today. There are several issues before the Court today. However, foremost is the defense's contention that the district judge applied the wrong burden of proof to the evidence in this case. That makes a considerable difference in this case, Your Honor, because the district court, in its findings of what constituted reasonable suspicion in this case, the court found that the officer had observed evasive driving and that that was part of his reasonable suspicion to detain Mr. Goebel. That makes the burden that was placed on Mr. Goebel to prove that that was not evasive driving is just fundamentally flawed in this process because the government should have been able to prove, should have been required to prove, that that, in fact, that evasive driving was suspicious. Because the reason that the officer... We're looking at that for plain error, right? Because there was no objection at the district court? Your Honor, that is correct. The magistrate judge did note in its recommended finding in fact, did make a notice of the burden being looking at the evidence in the light most favorable to the government. We did not object to that. However, we had no idea that the district judge was going to apply that standard to the evidence. We did not have an opportunity to object to the district judge's findings. We did make our objection in our brief in chief. But our position is that under any standard... Didn't the fact that the magistrate judge said that was the standard likely mislead the district court to just copy that? And if you had objected, that would have brought it to the judge's attention? It may have, Your Honor. Yes, that is true. I can tell the court, I did not catch that in my findings of facts to the district judge. However, once we did receive the order from the district court, we did notice it was the wrong standard and did bring that to the court's attention in our brief in chief. Couldn't you have filed a motion for reconsideration based on that? Your Honor, I believe that I guess there probably would have been... I guess I could have attempted that, but that was not what the rules require, I mean, for the four in our opinions. So my position is that under any standard, whether it is plain review, that when findings of facts are based on the application of an incorrect burden, then the findings cannot stand. And in particular, because that's how it starts out in this case, the facts are that the initial encounter with Mr. Goble occurred when a patrol officer was at a four-way stop sign. Mr. Goble pulled up behind the patrol unit. The patrol unit proceeded forward through the four-way intersection, and Mr. Goble immediately turned on his signal and the officer immediately made a U-turn and followed Mr. Goble through several turns through a residential area. Of course, there's nothing wrong with that. And it was 3.30 a.m. in the middle of the night, right? Right. Yes, Your Honor, and that's our position, is that there is nothing suspicious about that because that would have applied to any, I mean, any car that... But the officer testified he viewed it as suspicious because most people turn on their turn signal before they approach the light, so... That is correct, Your Honor. What he stated was that we don't normally see that. When the magistrate judge asked him, what is suspicious about that, he said, we don't normally see that. So he followed him, but that's not... There's nothing wrong with that. No, Your Honor, there's nothing wrong with that, but there's nothing suspicious about turning your signal on and turning right that any vehicle that would have come to that intersection and made a... Put on his blinker, I mean, would... That does not give the officer reasonable suspicion to follow them. And then the court found that by making several turns that that was also evasive, that that led to the finding that the driving was evasive. But the evidence presented at the motion to suppress hearing showed that that was actually the direct route that a person would take from that intersection to the address to where he pulled into the driveway. So there was nothing evasive, but by applying the burden of taking... Why wasn't there... Why didn't they develop a reasonable suspicion of the officer of trespass or attempted burglary? The car pulls into a driveway, there's pass... Two passengers two people in the car, two passengers, correct? Correct. And the driver runs to the... Walks swiftly to the back of the house. I mean, wouldn't that at least justify a Terry stop to investigate, you know, make sure nothing's amiss? 3.30 a.m., lights aren't on the house, et cetera, et cetera. Well, you know, it was our position that that did not constitute reasonable suspicion. But even if it did, if the court wants to find that that was reasonable suspicion, just to make a Terry stop to see what are you doing here? The fact that the first interaction... Which they did, and he was told... I mean, he was given a story by one of the passengers that didn't square, so the next thing he did was he knocked on the door and asked the homeowner. Right, Your Honor, but... At that point, right, that's starting to look pretty fishy. Well, the officer is wondering what is he doing at this... Pulling up to this house at that time of the night, and then when he talks to the passenger, the passenger tells him, we're here to pick up our friend. So that, I mean, what is... And the passenger doesn't know the address that they're at, I think was the reason the officer said he thought that added to the suspicion, correct? For what that's worth. That's correct. He did not know the numerical address of where they were. And I would submit that most people do not know numerical addresses and cannot cite a numerical address off the top of their head for most people. Many people may know where their friends live or where their relatives live, they know the house. It's a totality of the circumstances, you know, here. But I guess my question is, even assuming he lacked reasonable suspicion, even assuming this was an improper seizure, how do you get to causation? The problem you have is the seizure, at least if we find that the seizure didn't occur until after the defendant returns to the vehicle and he asks him to... The officer asks him to stand at the sidewalk. If we find that that's when the seizure occurred, you have a problem because he's already gotten rid of the weapons back in the alley. So how do you tie the actual evidence to the improper seizure? Your Honor, well, it's the defense position that the seizure actually occurred at the time when he was actually just opening the door. Well, I understand that. And assuming that's not the case, because that's a tough one to show, considering the officer moved his car behind their vehicle, but then before this defendant ever comes back, he's moved his car to the street. So we don't have, really you just don't have a seizure. Your Honor, well, so assuming you're not correct on that, assuming that, and assuming there was a seizure later at some point, how do you connect up the... Well, Your Honor, I would connect up to the fact that the abandonment of the firearm was not voluntary on Mr. Goebbels' part. Why? Well, first of all, in the statements, and it's of record, I think it's government's record, when the officer is talking to Mr. Goebbels, Mr. Goebbels tells him, I saw you. I saw you when I opened my door. You pulled up. I saw you out of the top of my eye. He knew that the officer... But he wasn't seized. You still have to connect it to the seizure. You've got to connect it to the unlawful conduct. Well, Your Honor... The fact is, he might have been a little concerned at this point, because he does know there's an officer following him. But that doesn't connect the dots for you. Well, Your Honor, it's our position that the totality of the circumstances, when you take into consideration the encounter that a person has with a police officer, the fact that it's going to be intimidating for anybody, for a police officer to suddenly make a U-turn and then follow you through several turns through a residential area... I agree it's intimidating. I don't disagree with that. That's not my question. You've still got to tie it to the seizure. There's no way around that that I know of. Well, Your Honor... Unless you can point me to some case law. Mr. Goebel said that he saw him get out. So if the officer had not pulled up when he got out of the car... But he wasn't seized at that point. That's the problem. Okay. Well, Your Honor, I guess our position would be that the officer would not have found, but for at the point... He did seize Mr. Goebel at some point, at least when he did not allow him to get back into the car. But for his seizing and detaining Mr. Goebel, I don't believe he would have found that firearm. He would not have... He testified he would have, that even based on what he saw, he was going to go back and check that alley no matter what, whether he'd stopped or not. And the point is, Your Honor, that that's what officers maybe should do. If they don't have the reason to detain the individual any longer, they had given him a reason why they were there, that he had no reason to hold him longer. And basically, the officer doesn't get to cause the situation that allows him to search. He used the words, even though both of them had said, I'm here to pick up a friend, that he held them there, asking them to cite the numerical address. They could not do that, and the officer used the fact that they could not cite the numerical address to hold them even longer. And then to conduct this search. And what we want for these officers, we don't want them to be able to just, because they got lucky, get away with this type of behavior. So what he should have done is, yes, if he would have gone back, let Mr. Goebel be on his way, gone back, and if he would have conducted a search, maybe he would have found the firearm, maybe not. But our position is, at the suppression hearing, there was testimony, and it's up in the video, that that backyard was just full of places where Mr. Goebel could have stashed that firearm. There were old appliances, shrubbery, all kinds of things. And he did not do that. He actually put it in the alley, in a very visible place where it could be retrieved. And our position was, he did not intend to abandon it. He likely would have just gone around and picked it up once he was able to, very quickly. And at that time of the morning, I think he had a reasonable expectation that nobody else was going to pick it up before he has a chance to get it. Even though he saw the officer out of the corner of his eye as he went back there? Yes, Your Honor. He saw them, I mean, he saw them this way. That's why I think he placed it. He could have put it in a backyard, but it's much harder to retrieve a firearm from a gated backyard than from an alley where you placed it in a visible place. But Your Honor, if the court pleases, I would like to reserve some of my time. Before you sit down, on the Fifth Amendment suppression issue, I really didn't see that the statements were particularly or at all incriminating. I mean, what's suppression get you here? Your Honor, our issue with the statements initially were the statements that Mr. Goble gave while he was standing on a sidewalk about not having, not knowing the numerical address and not, supposedly his name is Joseph. Those types of things that we were initially intending to suppress had this case proceeded to trial. Got it. Okay, great. Thank you. Thank you. Let's hear from the government. Good morning. May it please the court, counsel, Aaron Jordan appearing on behalf of the United States. I'm an assistant United States attorney in Las Cruces, New Mexico. Could you put the mic just a little bit closer to your- Is that better, Your Honor? Yeah, that's great. Thank you. Okay. When this court looks at the record, and that record includes video, a fairly extensive amount of video that records all of the interactions between Officer Barleen and Mr. Goble, as well as the transcript and the proceedings during the suppression hearing, under any light by any standard, no Fourth Amendment violation occurred in this case period. The court is correct in asking counsel about the temporarily blocked driveway and whether  it clearly did not. In all of the blocked driveway cases, we'll call them that Mr. Goble cites, those were situations in which the police car was actually parked. More importantly, in every single one of those cases, whether the defendant was a passenger or a driver, they were actually inside the vehicle when it was obstructed by a police car. That clearly was not the case here. During the 10-second interval that Officer Barleen was- he wasn't even parked, he was still in drive- was behind Mr. Goble's car, checking the license plate, and also watching Mr. Goble proceed past the side door, further into the backyard, out of sight. Mr. Goble obviously was not in the car. There was no one in the driver's seat, and there was no evidence at the suppression hearing that Mr. Goble was even aware that his car was blocked at that point. I think we've already indicated that's not a big deal. Okay. Then I'll move on, Your Honor. It may be a big deal that the court's using the improper standard in this case. Can you elaborate on that? I raise it too, because I think I've seen it in another case out of the District of New Mexico, and I want to make sure that the defenders and the U.S. attorneys are on the same page on burdens. Yes, Your Honor, and so the court's absolutely correct. The standard mentioned by the magistrate judge on page 206, as well as the standard repeated It's the same exact language repeated from the PFRD and into the district court order on page 240 of the record on appeal. The light, most favorable language is clearly incorrect. As the court noted, defendant did not object to that below. Defendant did object to 28 different aspects of the PFRD, but did not raise that issue. Defendant also did not argue for plain air review in his opening brief. What do you say to his argument that he didn't realize the district court was going to apply the wrong standard until the opinion came out and he's raising it on appeal? Well, I agree with the court's point to counsel, that there's a very high likelihood that had Mr. Goble objected at the PFRD stage, that language would not have been repeated in the district court order. And so it's the same exact language if the court looks at pages 206 and 240 of the record on appeal. So what? He still wouldn't have known that the district court was going to do that. And that's correct, Your Honor. And the court is also correct that defendant could have filed a motion to reconsider at that point as well. But did he have to? I don't believe he had to. So here we are. Correct. The district court applied the wrong standard and what do we do with that? Okay. And so, well, as Judge Timkovich mentioned, if the court does decide to exercise its discretion under Rule 52B, that review must be done under a plain error standard. And so there was an error. It was clear. But did it affect substantial rights? And in order for it to affect substantial rights, Mr. Goble had to show that but for the use of the incorrect standard, the outcome would have been different. And that's... He's not objecting to the magistrate's decision. He's objecting to this district court applying the wrong standard. And if he didn't have to file a motion for reconsideration, why is it a plain error standard? Why don't we just review it under regular standard? Well, because it wasn't raised below period, Your Honor. And the government disagrees with the proposition that there was no opportunity and that there was no warning. Clearly, the findings that the district court made were based on the recommendation by the magistrate judge in this case. And so it's the government's position that Mr. Goble was, in fact, on notice of everything that was in the PFRD. That was his opportunity to object below. And he did not avail himself of that opportunity. And so did he have to object? No. Did he have to file a motion to reconsider? No. But the simple fact remains that it was not raised below. Did the district court give any indication ahead of time that he was going to apply the wrong standard? No, Your Honor. There was no indication from the district court as to the outcome and what the order would be until the order itself was issued. And so, but it's, and the court is correct that recommendations from a magistrate judge are just that. And the district court employs a de novo review when there are objections to the PFRD. That's what happened in this case. But it is, it remains the government's position that plain error review is what's required in this case. And I'll talk a little bit about plain error at this point. Going back to whether or not the incorrect standard made any difference, and I'll also note, also on pages 206 and 240 of the Record on Appeal, both judges, both the magistrate judge and the district court judge, use the correct standard, the correct evidentiary standard as far as placing the burden on the government, and that the government has to prove that there was no Fourth Amendment violation by preponderance of the evidence. And so that's clearly referred to correctly by both the magistrate judge and the district court in this case. But as far as whether or not the standard made any difference, the government notes that there were 58 factual findings by the magistrate judge in this case. Fifty-six of those factual findings were not objected to. And so those 56 factual findings, obviously all the factual findings by the magistrate judge were adopted by the district court. But 56 of the 58 were undisputed. There was a very minor defense witness at the suppression hearing who was just there to introduce photos that he took of the scene more than a year after the incident. The main witness was obviously Officer Barleen. And Officer Barleen, in most regards, his testimony was not contradicted. And again, there's extensive video. All of the interactions between Officer Barleen and Mr. Gobel were recorded that evening and are available, they're attached to the record on appeal for this court to review. So this case was not a close call. This was not a situation in which either the magistrate judge or the district court employed the incorrect standard to resolve a factual dispute or explicitly even use that standard to resolve any disputes. As far as the two objections that were actually two factual findings that Mr. Gobel made, those had to do with, as counsel discussed, whether or not activating a turn signal after reaching a stop sign and then quickly turning to the right. Whether or not Officer Barleen considered that to be suspicious. It's clear from the magistrate judge's questioning of Officer Barleen on page 141 of the record, where Officer Barleen mentions, or the court mentions, that Officer Barleen described that as dodging out on him, that he thought Mr. Gobel was trying to avoid him and found that suspicious. And so the record does support both of those factual findings. And so the government would urge the court, when it comes to the 56 factual findings that were not objected to, that the district court adopted, that clear error review is still appropriate as to those factual findings. If the court, the court in its discretion can give no deference on the two factual findings that were not objected to, and can even take a fresh look at the record, given the amount of material that's available for the court in this case. As the government cited Snyder, the court can affirm the district court based on any grounds that are adequately supported by the record. Even if those grounds are different from the district court's grounds. And so again, to reiterate, there was no plain error in this case, and the government's asking the court to affirm. The outcome, and I'll add this at this point, if for some reason this court found it appropriate to remand to the district court to reevaluate the transcript and the videos from the suppression hearing in a light that's not favorable to either party, the outcome is going to be exactly the same. And so that standard clearly made no difference in the outcome of the suppression ruling. At what point in time was reasonable suspicion developed that would allow an investigatory stop? Your Honor, the government's position is that occurred when Mr. Goble came back to his car, tried to reenter the driver's seat, and was not allowed to. And so I believe there's 11 facts that were relied on by both a magistrate judge in the district court that were known to Officer Barleen at that time. To go into that decision as whether or not there was reasonable suspicion to detain him at that time. The first is, of course, has to do with Mr. Goble's apparent attempt to evade the officer with the series of sudden turns, the belated signal, the fact that it was around 3.30 in the morning. Officer Barleen describing the area as a high crime area. Goble's unusual parking, according to Officer Barleen. That's on pages 166 and 167 of the record on appeal, where his front left tire's on the lawn and he's partially blocking the sidewalk. The fact that Goble did not approach the front door, again at 3.30 AM. The fact that Mr. Goble walks into the backyard through a side gate. The fact that Mr. Riley gets out of the vehicle and approaches Officer Barleen, Officer Barleen interprets that as an attempt by Mr. Riley to distract him. The fact that Mr. Riley cannot tell Officer Barleen the address of the residence. The fact that there's no lights on inside the driveway, I mean inside the residence of 1504 Adams. And the fact that the van in the driveway had an open door, which Officer Barleen first noticed when he pulls up to get the license plate number and watch where Mr. Goble is going as he proceeds past the side door. And so there's 11 facts that combine under a totality of the circumstances. Where was the side door? Was the side door along the driveway or in the back? No, Your Honor, so the side door was, there's the front door and next to that is the carport. And if you go under the carport, there's a gate in it that leads to the backyard, that's on the side yard. And then as you're walking through that gate, on your left-hand side is a side door. And there's porch lights up, the storm door was open on that side door. And as Officer Barleen pulled forward, he could clearly see that Mr. Goble walked straight past that side door. So you can tell that from the video or testimony or? That's primarily, you cannot, Officer Barleen, you cannot see that from, it's too far to see with the camera. And I believe it also occurs right before the camera engages. There is about a 30 second delay. But he testified that he could see that he didn't go into the side door. That's correct. I think it was unclear at that point whether or not he knocked on the side door. But Officer Barleen could clearly see that he did not stop at the side door, that he walked right past it. The court is correct that there is no factual nexus, there's no causal connection. The detention has nothing to do with the gun being retrieved. Officer Barleen was already aware of the facts he needed to search. And I see that I'm running short on time. If there's no further questions, the government will rely on its brief for the rest of the matters. I'll thank the court for its time. Thank you, counsel. Your Honor, I would like to reiterate that when, because the findings of fact in this case were all based on the application of the wrong standard or the incorrect burden of proof, that none of the findings of facts can stand in this case. And I, if the court applies a plain error standard, I would ask the court to consider that the fact that all of the evidence was taken in the light most favorable to the government at that, at the motion to suppress hearing when the burden actually should have been on the government. All of the facts were skewed, were skewed. And it's, there is such a fundamental imbalance in favor of the government. Why is that true when the magistrate judge made findings of fact and the defendant objected only to two of them, as he says? Your Honor, well. And the magistrate had stated how it was reviewing the facts and he didn't object to that. So, if he's only objecting to two of the magistrate judge's facts, doesn't the district court accept all the other ones? Your Honor, he can if he's applying the same wrong standard. But he's not applying any standard. He's just accepting them because the defendant didn't object to them. How do you get around that? Your Honor, the, well, I think that the one that I did object to was the most prevalent and the most important because that was what, that was the initial reason that the officer began to follow Mr. Goble in the first place, that was the evasive driving that was cited by the district judge as, to give him reasonable suspicion, not only to detain. That was only one of the factors. Yes, Your Honor. But I think it was the most important factor in this case. Okay, thank you. Okay, counsel, your time's expired. Thank you very much. We appreciate the arguments. Thank you, Your Honor. And the case will be submitted and the counsel excused, although I hope that the U.S. attorney, you know, you can get the standard of review issue resolved in your motions practice below. Thank you. Thank you, Your Honor.